*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0249p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

SCOTT E. MCKENNA,
      *Plaintiff-Appellee/Cross-Appellant,*

      *v.*

      Nos. 08-2080/2393

P. EDGELL and B. HONSOWETZ,
      *Defendants-Appellants/Cross-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-74546—John Corbett O'Meara, District Judge.

Argued: October 15, 2009

Decided and Filed: August 17, 2010

Before: MOORE, ROGERS, and GIBSON, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:** Susan Lumetta, CUMMINGS, McCLOREY, DAVIS & ACHO, P.C., Livonia, Michigan, for Appellants. David R. Parker, CHARFOOS & CHRISTENSEN, P.C., Detroit, Michigan, for Appellee. **ON BRIEF:** Susan Lumetta, CUMMINGS, McCLOREY, DAVIS & ACHO, P.C., Livonia, Michigan, for Appellants. David R. Parker, CHARFOOS & CHRISTENSEN, P.C., Detroit, Michigan, Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellee.

      MOORE, J., delivered the opinion of the court, in which GIBSON, J., joined. ROGERS, J. (pp. 20-27), delivered a separate dissenting opinion.

_____

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  Scott E. McKenna ("McKenna") brought suit against two Royal Oak police officers ("the defendants" or "the officers") who responded to a 911 report that McKenna was having a medical seizure and who thereafter allegedly violated his Fourth Amendment rights.  The district court rejected the officers' argument for summary judgment based on qualified immunity, and they sought interlocutory appeal.  We dismissed the appeal for lack of subject-matter jurisdiction because the officers' arguments for qualified immunity turned on disputed facts.  The case proceeded to trial, where the jury awarded McKenna $6,000 for medical bills and $275,000 for pain and suffering.  The district court then denied the defendants' motions for judgment notwithstanding the verdict and for a new trial but reduced the award for pain and suffering to $10,000.  The jury and district judge having spoken, the case is before us now on two issues:  first, whether the officers were entitled to qualified immunity, and second, whether the remittitur was improper.  Because we hold that the jury reasonably could have found a set of facts indicating that the officers acted in an objectively law-enforcement rather than medical-response capacity, we **AFFIRM** the denial of qualified immunity.  We also **AFFIRM** the reduction of damages based on the settled doctrine that a plaintiff who accepts a remittitur may not appeal it.

## I.  BACKGROUND

### A.  Factual Background

We recounted many of the operative facts in our opinion dismissing the officers' interlocutory appeal from the district court's denial of summary judgment:

> In the early morning of March 18, 2004, Scott McKenna was suffering
> from a seizure in his home in Royal Oak, Michigan.  At that time,
> McKenna was a single father living with his three daughters, Alexandra,
> Samantha, and Jessica.  Alexandra, his then fourteen-year-old daughter,
> called 911 and told the dispatcher that she thought her father may be

having a seizure or choking. Officers Edgell and Honsowetz were dispatched to assist a man having trouble breathing. The officers arrived before any other emergency personnel. Alexandra directed the officers to McKenna's bedroom, where they found McKenna lying in bed.

The course of events after the officers entered McKenna's bedroom is disputed. Alexandra testified that she "couldn't see exactly what was going on" for some period, because she was talking to one of the officers. However, she also testified that this period was "for about a minute . . . . So I was standing there watching it all." According to Alexandra, the officers instructed Scott McKenna to get out of bed and to get dressed. McKenna got up and started to pick up his pants, but then sat back down on the bed and began to lie back down. Alexandra testified that the officers then "picked him up by his hands, and they like pulled him up from the ground and told him to put his pants on." McKenna then sat back down and, according to Alexandra, "was telling them to stop." According to Alexandra, the officers continued to try to get McKenna out of bed while McKenna "just laid back down." Finally, Alexandra testified, the officers handcuffed McKenna's wrists and ankles, and only then did McKenna begin struggling with them.

Contradicting the testimony offered by McKenna's daughter, the officers said that after they found McKenna unresponsive to verbal questioning, Officer Edgell placed his hand on McKenna's upper arm or shoulder to try to rouse him. Officer Edgell testified that when McKenna did rouse he immediately became aggressive and violent, pushing them and causing Officer Honsowetz to fall backwards. The officers asserted that it was necessary to handcuff McKenna because of his violent behavior.

Firefighters arrived as the officers were already restraining McKenna. Scott McKenna has no recollection of the events that took place during his seizure.

*McKenna v. City of Royal Oak*, 469 F.3d 559, 560 (6th Cir. 2006). The parties testified to those facts at trial.

In addition, Alexandra testified that when the officers arrived, one of them asked her whether McKenna was on drugs and whether he had assaulted her. She answered no to both questions. While or just after firefighters and emergency medical personnel placed McKenna on a stretcher and removed him from the premises, the two officers searched through McKenna's bathroom medicine cabinet and the top drawer of his dresser. They testified that they were looking for prescription or illegal drugs.

Alexandra testified that the officers threw out the baby teeth of all of his children that her father kept in the cabinet and that they knocked down all of the objects on top of the dresser.

Officer Honsowetz admitted that even in responding to medical emergencies, he is always aware that criminal activity may be involved and he is "always looking to investigate it." Trial Tr. 2/12/08 at 41 (Document ("Doc.") 108). He testified that he wrote a report explaining that when he responded to McKenna's home, he believed he might be dealing with an intoxicated person, a person on drugs, or a person having a diabetic reaction. At some point during the encounter, Honsowetz ran McKenna's license plate but did not run his information through the Law Enforcement Information Network ("LEIN"), which tracks criminal history and outstanding warrants.

Both parties introduced evidence as to the proper medical protocol for responding to emergency calls. McKenna's witnesses stated that the appropriate response to a medical seizure is not to restrain the subject but rather to clear the area and let the episode run its course. A firefighter testified, "[w]e don't handcuff patients." Trial Tr. 2/19/08 at 72 (Doc. 119). Firefighters and paramedics testifying for the defendants stated that they are trained to initiate physical contact to rouse a nonresponsive subject, to restrain the subject for safety if necessary, and to look for indications in the environment that might explain the subject's condition.

**B. Procedural Background**

McKenna initially sued the City of Royal Oak, Officers Edgell and Honsowetz, and a third officer, pleading deprivation of civil rights under 42 U.S.C. § 1983 and several state claims. The district court declined to exercise supplemental jurisdiction over the state claims and dismissed the § 1983 claim against the third officer, who was not personally involved in the events of March 18. The court then granted summary judgment for the City based on McKenna's failure to allege facts sufficient to amount to deliberate indifference in training, but it rejected Edgell and Honsowetz's qualified-immunity argument. The court held that the facts could support a Fourth Amendment violation. We agreed with the district court on interlocutory appeal, dismissing the case

for lack of subject-matter jurisdiction. *McKenna*, 469 F.3d at 562. The officers moved for summary judgment a second time, arguing that because they had acted in response to a medical emergency, they were qualifiedly immune from suit under *Peete v. Metropolitan Government of Nashville and Davidson County*, 486 F.3d 217 (6th Cir. 2007). The district court denied the motion. It found *Peete* inapplicable because, when viewed in the light most favorable to McKenna, the facts did not make clear "that the police officers were attempting to provide medical assistance." Op. & Order Denying Defs.' Second Mot. for Summ. J. at 6 (Doc. 53).

The case proceeded to trial in 2008, resulting in a jury verdict for McKenna and an award of $6,000 for medical bills and $275,000 for pain and suffering. The district court denied the officers' motion for judgment notwithstanding the verdict and for new trial, in which the officers had again argued qualified immunity, but it granted a motion for remittitur, reducing the pain-and-suffering award to $10,000. As to qualified immunity, the district court held:

> [I]t is clear that a reasonable jury could come to the same conclusion that this jury came to, that is that Plaintiff's Fourth Amendment rights were violated. The evidence indicated a search was conducted and a seizure was made, both of which according to Plaintiff's evidence and witnesses were contrary to established procedure in dealing with seizures. It is apparent that the jury gave more credit to Plaintiff's case than it did Defendants' case which is its right. Although the court may disagree with the jury's findings, that alone is not enough to grant judgment notwithstanding the verdict or a new trial.

*McKenna v. City of Royal Oak*, No. 04-74546, 2008 WL 2831233, at *2 (E.D. Mich. July 21, 2008). The court also expressed concern that the law leaves police uncertain of how to act when responding to a medical emergency; it commented that "it would be of benefit if the Sixth Circuit were to directly address the issue of law enforcement's obligation to the Fourth Amendment when law enforcement acts in a non-law enforcement capacity." *Id.* at *4. The district court denied a motion to reconsider the remittitur and gave McKenna the choice of accepting the reduction or proceeding with a new trial as to both liability and damages. McKenna accepted the remittitur on

September 15, 2008.  Officers Edgell and Honsowetz now appeal the district court's denial of qualified immunity, and McKenna challenges the remittitur on cross-appeal.

## II.  ANALYSIS

### A.  Standard of Review

The officers appeal the district court's orders denying their first motion for summary judgment, second motion for summary judgment, and post-trial motion for judgment notwithstanding the verdict and for new trial under Federal Rule of Civil Procedure 50(b), all of which turned on the issue of qualified immunity.  Under these circumstances, we review the final order, which was rendered with the benefit of all evidence presented at trial.  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 899 (6th Cir. 2004).  We review de novo an order denying a Rule 50(b) motion, with all reasonable inferences drawn for the nonmoving party.  *Id.* at 899–900.

In *Champion*, we described the additional considerations that apply when the dispositive issue is qualified immunity.  Qualified immunity is a question of law, but "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."  *Id.* at 900 (internal quotation marks omitted).  "Thus, to the extent that there is disagreement about the facts," such as whether the officers handcuffed McKenna before he showed any aggression, "we must review the evidence in the light most favorable to the Plaintiff[], taking all inferences in [his] favor."  *Id.*  Here, as in *Champion*, "we are acutely aware that a jury, faced directly with the tasks we cannot undertake, believed the evidence presented by the Plaintiff[]."  *Id.*

In his cross-appeal, McKenna appeals the district court's grant of the officers' motion for remittitur and its denial of his motion for reconsideration under Rule 60(b).  Remittitur and relief from a judgment or order lie in the discretion of the district court.  *See Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 443 (6th Cir. 2000); Fed. R. Civ. P. 60(b).  We therefore generally review the district court's reduction of damages for abuse of discretion.  *Gibson v. Moskowitz*, 523 F.3d 657, 663 (6th Cir. 2008).  "Once a

plaintiff has accepted a remittitur order," however, "he cannot appeal it." *Anderson v. Roberson*, 249 F.3d 539, 542 n.2 (6th Cir. 2001).

## B. Qualified Immunity

Whether government officials performing discretionary functions are entitled to qualified immunity involves two questions: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (internal quotation marks omitted). In accordance with this framework, the officers advance two independent reasons why qualified immunity applies to them: First, as responders to a medical emergency, they assert that they are immune from suit under *Peete*, which held that liability under the Fourth Amendment for torts committed by firefighters, paramedics, and emergency medical technicians ("EMTs") in the process of responding to a medical emergency is not clearly established. Second, the officers argue that McKenna was incapable of submitting to any show of authority, such that he could not have been "seized" within the meaning of the Fourth Amendment.

### 1. Whether the Right Was Clearly Established

The defendants' primary argument is that this case is governed by our observation in *Peete* that "there are no cases applying the Fourth Amendment to paramedics coming to the aid of an unconscious individual as a result of a 911 call by a family member." 486 F.3d at 220. In *Peete*, firefighters, paramedics, and EMTs responded to a 911 call reporting that the plaintiff was experiencing an epileptic seizure. *Id.* To stop him from moving, they tied his hands and ankles behind his back and used their bodies to apply pressure to his head, neck, shoulders, arms, torso, and legs. *Id.* They did not take precautions to ensure he could still breathe, and he died shortly after being restrained. *Id.* Emphasizing the defendants' intent to provide medical aid to the plaintiff, the panel stated that the plaintiff's estate's excessive-force claim "looks like a medical malpractice claim." *Id.* at 222. It noted that "improper medical treatment by a government employee, standing alone, does not violate the Fourth or Fourteenth

Amendment." *Id.* The court applied the doctrine of qualified immunity because "there is no 'clearly established law' creating federal liability for a constitutional tort" that occurs when paramedics responding to an emergency restrain a person "while trying to render aid." *Id.* at 219. The officers contend that this holding applies here because they, like the defendants in *Peete*, acted in response to a medical emergency.

There are two ways to think about whether *Peete* applies to the facts of the instant case. First, as argued by McKenna, the fact that the defendants here are police rather than medical-care personnel may render *Peete* inapplicable. As a general matter, exposure to liability does not depend merely on the profession of the government actors. It would not be coherent, for example, to say that paramedics who strap a patient to a gurney without medical need, search his home for evidence of a crime, and forward what they discover to the police do not violate the Fourth Amendment, simply because they are paramedics. On the other hand, the fact that a government agent is a police officer clearly matters in some cases—for example, when it bears on the question of whether a person is "seized" under the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion) (explaining that a person is seized when the surrounding circumstances, such as "the threatening presence of several officers" are such that "a reasonable person would have believed that he was not free to leave").[1] The officers urge us to follow the lead of two district courts that have applied qualified immunity to police based on *Peete*. *See Daniels v. Bowerman*, No. 08-10278, 2008 WL 2743918 (E.D. Mich. July 14, 2008); *Mills v. Hall*, No. 06-15689, 2008 WL 2397652 (E.D. Mich. June 10, 2008). We note that these unpublished lower-court cases are not binding upon us. The instant case, however, does not require us to resolve the question. Instead, we will assume without deciding that *Peete*'s holding could extend to defendant police officers.

A second way to think about *Peete* is that its applicability depends on a defendant's objective function or purpose. *Peete* may stand for the proposition that

---

[1]Of course, McKenna's claim that he was seized is based not on the presence of intimidating officers, but on the fact that they handcuffed him and pinned him down.

when a government agent acting in the *role* of a paramedic—any medical-emergency responders[2]—commits an unreasonable search or seizure, it is not yet clearly established that the conduct violates the Fourth Amendment. There is support for this interpretation in the *Peete* panel's opinion. It stated that qualified immunity turns on "the specific purpose and the particular nature of the conduct alleged in the complaint." *Peete*, 486 F.3d at 220. The panel held that the defendants there were protected because they intended only to provide medical aid: "The paramedics did not unreasonably seize [the patient] for the purpose of interfering with his liberty. They responded to [his] grandmother's call that he was experiencing an epileptic seizure and needed medical attention. They were not acting to enforce the law, deter or incarcerate." *Id.* at 222. On this logic, when officers do act to "enforce the law, deter or incarcerate," qualified immunity might not apply. So reasoned the district court in denying the officers' second summary-judgment motion in the instant case: "[T]he police officers here were not necessarily offering medical assistance. Although the police officers were first on the scene and 'first responders,' it is not clear that trying to get someone out of bed and get him dressed constitutes medical assistance." Op. & Order Denying Defs.' Second Mot. for Summ. J. at 6 (footnote omitted).

We conclude that whether the officers were entitled to qualified immunity depends on whether they acted in a law-enforcement capacity or in an emergency-medical-response capacity when engaging in the conduct that McKenna claimed violated the Fourth Amendment.[3] If the officers acted as medical-emergency responders, then

---

[2]The defendants here refer to such persons as "first responders." We eschew that term, as it unduly emphasizes the fact that these individuals get to a scene first rather than the fact that they go there to provide medical support—the critical element of their engagement for the purposes of *Peete*'s applicability.

[3]We are mindful of the challenges police officers face when acting as medical-emergency responders. Often, they are the first and only people on the scene. We acknowledge, as the district court did, the harm to the public that could result from officers' overexposure to liability for civil-rights violations. Qualified immunity is itself one way of negotiating the need to allow plaintiffs to seek relief and the need to protect law enforcement: even if officers violate a person's constitutional rights, they will be shielded from suit unless the rights violated were clearly established and a reasonable police officer would have known of them. Moreover, we believe that the framework applied here offers the sensible middle ground sought by the district court: on the current state of the law, police accused of violations like those involved in the instant case receive immunity when they act as medical responders but not when they act in a law-enforcement capacity. To be sure, they may have to convince a jury of the role they objectively played, but the obligation to persuade a jury exists in all cases in which qualified immunity

McKenna's claim would amount to a complaint that he received dangerously negligent and invasive medical care. Under a function-dependent view of *Peete*, if any right to be free from such unintentional conduct by medical-emergency responders exists under the Fourth Amendment, it is not clearly established. *Peete*, 486 F.3d at 219. If the defendants acted in a law-enforcement (e.g., investigative or prosecutorial) capacity, however, McKenna's claim does not "look[] like a medical malpractice claim," *id.* at 222; rather, his claim is that he was subject to an unreasonable seizure and search. It is certainly clearly established that police violate the Fourth Amendment when they handcuff people whom they neither suspect of criminal wrongdoing nor believe to be a danger to themselves or others. *See United States v. Davis*, 514 F.3d 596, 607, 610 (6th Cir. 2008) (noting that an arrest is valid only if based on probable cause that defendant committed a crime); *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) ("The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others."); *cf. Marvin v. City of Taylor*, 509 F.3d 234, 248 (6th Cir. 2007) ("[I]t is clearly established that handcuffing an arrestee in an objectively unreasonable manner is a Fourth Amendment violation."). Likewise, a person has a clearly established right to be free from unreasonable searches, including a warrantless search in the absence of exigent circumstances or some other warrant exception. *See United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008).

We stress that whether the officers acted as law enforcement or as medical responders is an objective inquiry. *See Davis v. Scherer*, 468 U.S. 183, 191 (1984) ("*Harlow v. Fitzgerald*, [457 U.S. 800 (1982),] rejected the inquiry into state of mind in favor of a wholly objective standard."); *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985) (noting that the Supreme Court "purged qualified immunity doctrine of its subjective components" in *Harlow*).[4] It is not relevant, therefore, whether Officers Edgell and

---

turns on disputed facts.

[4]Consideration of purpose or motive is relevant only when it is an actual element of a constitutional claim. *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998) (citing, inter alia, discrimination under the Equal Protection Clause and retaliation for exercise of First Amendment rights).

Honsowetz had a law-enforcement or a medical-response intent; the focus must be on what role their actions reveal them to have played.

The issue is then whether this objective determination of the role that the officers played at McKenna's home is for the jury or for the court.[5]  We hold that it is properly a jury question because "the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury." *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (internal quotation marks omitted) (alteration in the original).  The objective character of what role the officers played depends on what actually happened in the early-morning hours of March 18, 2004, and on what a medical-emergency responder would have done under the circumstances.  The jury heard testimony on both of these factual issues.  Firefighter Shawn Lambouris testified that in responding to medical emergencies, "[w]e don't handcuff patients."  Trial Tr. 2/19/08 at 72.  Both sides introduced evidence about the general protocol that medical personnel follow when dealing with a person having a medical seizure, evidence from which the jury could have determined whether the officers acted in a law-enforcement or medical-emergency-responder capacity.

The dissent insists that the ultimate characterization of the historical facts found by the jury—that is, whether the conduct looked like law-enforcement or medical-emergency-response work—is a legal question for the court.  One complication with this approach is that we have sometimes reserved for the jury determinations that appear to be legal in civil-rights suits under the Fourth Amendment.  The reasonableness of officer conduct in excessive-force cases is a question for the court.  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Muehler v. Mena*, 544 U.S. 93, 99 (2005).  But we ask the *jury* to determine whether a set of facts amounted to exigent circumstances.  *See, e.g.*, *Ewolski*

---

[5]We note that as a general matter, there is nothing inappropriate about asking a jury to make an objective finding.  Indeed, they are often called upon to apply objective tests.  *See, e.g.*, *Anton v. SBC Global Servs., Inc.*, 350 F. App'x 39, 42–43 (6th Cir. 2009) (unpublished opinion) (explaining that the jury permissibly applied an objective test, examining the words and conduct of the parties, to interpret a sales-commissions contract).  Some of our sister courts have even allowed the issue of whether a police officer committed an objectively reasonable mistake of law to go to a jury.  *See Curley v. Klem*, 499 F.3d 199, 208–10 & nn.8–10 (3d Cir. 2007) (citing cases from the Fifth, Ninth, and Tenth Circuits; noting that the First, Fourth, Seventh, and Eleventh Circuits find this approach impermissible; and showing that cases from the Second and Eighth Circuits go both ways).

*v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (noting that "exigent circumstances is normally a question for the jury," but that "where a finder of fact could reach but one conclusion . . . the issue may be determined by the trial court as a matter of law" (internal quotation marks omitted)); *Jones v. Lewis*, 874 F.2d 1125, 1130–31 (6th Cir. 1989) ("[W]hether a reasonable police officer, confronted with the situation facing the officers in this case, could reasonably have concluded that immediate action to arrest [plaintiff] was necessary in order to prevent his escape is not indisputable and, therefore, was a question for the jury."). And, inconsistently, we have at times asked the jury and at times reserved for the court the issue of whether a set of facts provided officers with probable cause. *Compare Parsons v. City of Pontiac*, 533 F.3d 492, 503 (6th Cir. 2008) ("We ultimately conclude that th[e] evidence, when viewed in the light most favorable to [the plaintiff], is *not* susceptible to only one reasonable determination—that the detectives had probable cause to arrest [him]."), *and Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 617 (6th Cir. 2007) ("[T]he jury heard testimony sufficient to support its conclusion that the officers arrested [the plaintiff] with probable cause."), *and Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) ("[W]e must determine whether a jury could conclude that a reasonable officer could have believed that the couple had probably committed or were committing a crime. There is substantial evidence supporting each party's position."), *with Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("[T]he jury does not decide whether the facts it has found are legally sufficient to amount to probable cause or entitlement to qualified immunity."), *and Ross v. Duggan*, 402 F.3d 575, 585 (6th Cir. 2005) ("[T]he judgment[] . . . that pre-

arrest probable cause existed on a given set of facts . . . is a mixed issue of law and fact reviewed by the courts *de novo*.").**[6] [7]**

It may be questioned why we have assigned some Fourth Amendment inquiries in civil suits to the court and others to the jury, but we need not reach into that thicket to resolve the instant case.  The objective question in this case involves a highly factual characterization, not a legal concept at the center of Fourth Amendment law like reasonableness in the use of force, exigent circumstances, or probable cause.  The law enforcement/medical-emergency responder distinction matters only in the narrow class of cases in which *Peete* might bar suit.  And while this question involves more than determining what acts took place, juries are often asked to go beyond the finding of historical facts and to make objective characterizations in their role as factfinders.  *See, e.g.*, *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 376 (6th Cir. 2009) (stating that whether conduct meets reasonable-person standard or rather is negligent is "a determination that is generally left to the jury"); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (stating that whether harassment is "severe or pervasive" such that it created a hostile work environment in violation of Title VII "is quintessentially a question of fact") (internal quotation marks omitted).  Moreover, it is not a determination with which we have any unique experience or expertise, and not one for which we can turn to our case law for guiding principles.  Like the jury, we would rely on the evidence about medical-responder conduct adduced at trial.  Were we to

---

**[6]**In *Ornelas v. United States*, 517 U.S. 690 (1996), the Supreme Court ruled that when reasonable-suspicion and probable-cause determinations are made by a district judge in the context of a motion to suppress in a criminal case, they are to be reviewed by the court of appeals de novo.  *Id.* at 699.  The Supreme Court did not consider whether those determinations might be for a jury in the § 1983 context, *cf. Jones*, 874 F.2d at 1130 (noting the different treatment of exigent circumstances in suppression and civil damages suits), and it is perhaps for this reason that our cases have continued to discuss them as jury issues since *Ornelas*.  The dissent makes a thoughtful argument that the lesson of *Ornelas* should be applied in civil suits.  As discussed below, however, our resolution of this case does not turn on this issue and we therefore need not resolve it.

**[7]**Note that in these cases, we have not merely said that the jury could find certain facts that would, as a matter of law, amount to exigent circumstances.  We have also said that the jury is entitled to determine *whether* a given set of facts satisfies those objective standards.  *See, e.g.*, *Parsons*, 533 F.3d at 503 (noting that viewing the evidence in the light most favorable to the plaintiff, "jury *could* find that the information known to the detectives when they arrested [him] falls short of this probable-cause standard" (emphasis added)); *Jones*, 874 F.2d at 1130–31 (leaving the issue of whether officers' conduct could be characterized as being in "hot pursuit" of the plaintiff—giving them exigent circumstances—up to the jury).

determine this issue, we would simply be substituting our judgment about the overall character of a set of facts for that of the jury. And while leaving the issue to the jury may lead to varied results, this is true of other objective characterizations left to the jury, as well. As in those cases, we retain the authority to make the determination as a matter of law when a reasonable jury could come to but one conclusion.

McKenna's jury clearly found that the officers had acted in a law-enforcement capacity. The jury concluded "[t]hat defendants Honsowetz and Edgell intentionally committed acts that violated the plaintiff Scott McKenna's federal constitutional rights not to be subjected to an unreasonable search or to excessive or unreasonable force during an arrest." Form of Verdict at 1 (Doc. 85). It found the officers liable after being instructed by the judge as follows: "[I]f you find that the police were not conducting a search for criminal purposes, then the Fourth Amendment does not apply and Plaintiff cannot recover on his claim of unreasonable search." Jury Instructions at 27 (Doc. 86). "Where the purposes [sic] to render aid in an emergency, rather than to enforce the law, the Fourth Amendment does not apply." *Id.* at 28. Both of these instructions were included at the officers' request. *See* Proposed Jury Instructions at 14, 31 (Doc. 82).[8] The defendants offered them with *Peete* in mind, *see id.* at 4, 13, 31 (citing *Peete*), and the district court properly adopted them to account for that case's holding that liability for persons acting in a medical-response capacity is not clearly established.

Accordingly, we must determine whether there existed any set of facts under which a reasonable jury could have found that, objectively, the officers acted in a law-enforcement capacity. We conduct that inquiry with respect to the two alleged violations in this case, the unreasonable seizure of McKenna's person and the unreasonable search of his home, and find sufficient evidence to support both. We also hold that even if the question of the officers' objective role is viewed as a question for the judge and not the jury, qualified immunity still does not apply. On the most plaintiff-friendly view of the

---

[8]Plainly, under these circumstances the officers cannot argue that the charge did not adequately instruct the jury as to the objective nature of its inquiry.

facts that could have been found by the jury, we too conclude that the officers acted in a law-enforcement capacity.

The jury easily could have found the following: The officers arrived at the McKenna residence in response to a 911 call reporting that McKenna might be having a seizure or choking. One of the officers asked Alexandra whether her father was using drugs, whether he had assaulted her, and whether anything like this had ever happened before. The appropriate response to a medical seizure was not to restrain the subject but rather to clear the area and let the episode run its course. Instead of following that procedure, the officers handled McKenna, repeatedly attempted to get him to put on his pants, and tried to force him to rise in the face of his request that they stop. Completely unprovoked by any aggressive or dangerous behavior, they then rolled him over, pinned him on his stomach with their knees, and handcuffed his arms behind his back and his ankles. After McKenna had been taken away to the hospital, the officers searched a dresser drawer in his bedroom and the medicine cabinet in the bathroom. In the process, they knocked down everything on top of the dresser and threw out his children's baby-teeth collection. One of the officers also ran a check on McKenna's license plate.

This view of the facts undoubtedly supports a finding that the officers acted in a law-enforcement capacity, and we would make the same judgment ourselves. That the episode began with a 911 call and that it ended with a hospital visit rather than an arrest are not the most probative facts. Those facts are to be expected in a medical emergency involving a patient who has not committed a crime. Moreover, those facts mostly involve the conduct of others, not of the defendant officers: Alexandra made the 911 call, and the firefighters took McKenna to the hospital. The meat of the inquiry concerns what happened between the very beginning and the very end—what the officers themselves did.

Like the district court, we fail to see how it serves any medical-emergency-responder purpose to persist in insisting that a medically seizing individual put on his pants. Questioning Alexandra about McKenna's possible drug use, meanwhile, is equally suggestive of an inquiry into the cause of McKenna's medical condition and of

an investigation into wrongdoing. It looks more like the latter, however, given that the officer also asked Alexandra about domestic violence. Even so, alone, these questions would make for a very close case. They are more consistent with law-enforcement behavior, however, when viewed against what happened next: the officers handled, subdued, and handcuffed McKenna at the hands and feet without any sign of violence on his part. All together, their treatment of him was consistent with their treatment of a criminal suspect believed to have abused illegal drugs.[9] This objective characterization of the officers' conduct provides a law-enforcement purpose for handcuffing McKenna: if an individual is on drugs or otherwise given to unpredictable behavior, restraining him gives the investigating officers greater control over the situation, protects the officers, and minimizes the individual's ability to interfere with their search. *See United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (holding that it was reasonable for an officer conducting a *Terry* stop and frisk of an individual he believed to be on PCP to handcuff that individual based on the officer's experience that "people on PCP can become extremely violent").[10]

The search conduct is consistent with this law-enforcement posture. Under ordinary circumstances, the officers' search reasonably would be consistent with a quest for clues about McKenna's medical condition, information that would be valuable to his treatment. But coming immediately after the officers handcuffed McKenna without cause instead of letting the medical seizure run its course, the search looks investigatory. Indeed, Alexandra's testimony that the officers knocked down all the items on top of the dresser and threw away the baby-teeth collection is consistent with a rummage for contraband and the indifference of a raid. Their jettisoning of McKenna's personal

---

[9]In fact, Officer Honsowetz later wrote in a report that he had exactly this scenario in mind during the McKenna incident. Of course, we do not consider that fact in an objective analysis of the officers' conduct.

[10]If McKenna had lashed out or otherwise posed a physical danger to himself or others, then restraining him would be consistent with medical-responder training and behavior. The dissent seems to recognize this in its second footnote. But if that is accepted, then it is difficult to say that handcuffing McKenna *without* any sign of violence was somehow a "response to McKenna's medical needs." Dissent at 26.

effects does not convincingly reflect an urgency for time-sensitive medical information: McKenna had been stabilized by medical personnel and taken to the hospital.

Finally, after all of this, the officers ran a check on McKenna's license plate. Though distinct from a search of the LEIN, a license-plate database search can produce incriminating information and is standard operating procedure in police incidents. *See United States v. Evans*, 581 F.3d 333, 337 (6th Cir. 2009); *United States v. Garrido-Santana*, 360 F.3d 565, 573 (6th Cir. 2004); *United States v. Mansur*, No. 08-3872, 2010 WL 1140996, at *3 (6th Cir. Mar. 25, 2010) (unpublished opinion); *United States v. Swain*, 227 F. App'x 494, 495 (6th Cir. 2007) (unpublished opinion). Certainly there is no self-evident medical-responder valence to such a search.

We note that our conclusion here is consistent with our dismissal of the officers' earlier interlocutory appeal. At that time, we observed that all of the officers' arguments for qualified immunity "rel[ied] on their own disputed version of the facts, not the facts as alleged by McKenna." *McKenna*, 469 F.3d at 561. We lacked jurisdiction to consider the appeal because there existed a set of facts under which the jury could find a violation of clearly established law. Our conclusion today recognizes that the jury did find those facts: it believed McKenna's version of the events and was fully capable of doing so.

The briefing on appeal does suggest one basis for relief that does not ignore the jury's reasonable findings of fact. We could hold as a matter of law that police officers who are dispatched to a location by a 911 call for medical attention—a fact emphasized by the dissent—always act in a medical-response capacity, regardless of the other facts in the record. This proposal would be an illogical and dangerous rule. It cannot be that an officer receives *Peete* protection simply because he was invited to the scene of a medical emergency. This proposition overlooks the possibility that an encounter that begins as medical in nature may evolve into one that is investigatory. More importantly, such a rule would give officers who respond to 911 calls free rein to rifle through callers' homes in search of incriminating evidence and to physically abuse callers in ways unrelated to anyone's safety. We decline to immunize misconduct of this sort; instead, we allow this case to stand on the judgment of the jury, in whose hands qualified-

immunity cases that turn on disputed facts have traditionally rested. *See Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989).

### 2. Whether There Was a Constitutional Violation

It is clearly a violation of the Fourth Amendment for police officers acting in a law-enforcement capacity to seize a person and search his home without probable cause. *Dunaway v. New York*, 442 U.S. 200, 213–14 (1979); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970). The officers do not contend that they in fact had probable cause. This is to be expected, as nothing in the record suggests McKenna or anyone in his family had committed or was committing a crime when the officers arrived. The officers argue instead that the evidence adduced at trial does not support a finding that McKenna was "seized" within the meaning of the Fourth Amendment. (They do not argue that his home was not searched.)

In *Peete*, the court explained that, objectively, a seizure is marked by "an intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit." *Peete*, 486 F.3d at 220–21 (citing, inter alia, *Bennett v. City of Eastpointe*, 410 F.3d 810, 833 (6th Cir. 2005)). The court considered the relevance of a case raised by the plaintiff there, *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006). In *Green*, the court denied qualified immunity to a fire-department lieutenant who arranged for a nonverbal ALS patient to be transported to the hospital despite the patient's insistence—through coded blinking and a talking computer—that he had recovered from his episode of breathing trouble and that he wanted to remain at home with his family. *Id.* at 71, 83–84. In distinguishing *Green*, the *Peete* court stated, "[u]nlike the instant case, the individual in the *Green* case was conscious and competent and objected to being taken into custody." *Peete*, 486 F.3d at 221. Apparently on the basis of this discussion in *Peete*, the officers argue that McKenna was not seized because he was not conscious during the incident at his home. Appellants' Br. at 38–40.

This argument is unavailing because there was sufficient evidence of McKenna's consciousness. Alexandra, who witnessed almost the entirety of her father's encounter

with the police, testified that he pulled away from the officers at one point: "[H]e pulled back. He didn't want to—he acted as if he didn't want to sit up at all. He just wanted to lay down." Trial Tr. 2/14/08 at 28 (Doc. 110). The officers point to McKenna's complete lack of memory about the incident, but it is possible for a person to be conscious during an experience and yet not remember it. Moreover, Alexandra testified that at one point, her father told the officers to "stop." *Id.* at 30.

Neither *Peete* nor *Green* calls into question the objective finding that the officers seized McKenna in violation of his Fourth Amendment rights. The officers do not contend that McKenna's home was never "searched" under the Fourth Amendment. The record contained ample evidence to support the determination that the officers unreasonably searched the home and seized McKenna. As described above, both actions violated clearly established constitutional rights, and the denial of qualified immunity was appropriate.

## C. Remittitur

On July 21, 2008, when the district court announced its intention to remit $265,000 of the jury's $275,000 award for pain and suffering, it offered McKenna the choice between the reduced award and a new trial. McKenna accepted the remittitur on September 15, 2008. The Supreme Court has clearly stated that a plaintiff cannot appeal a remittitur after he has accepted it. *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977). McKenna acknowledges this line of cases but argues that the cases were wrongly decided. As we are bound by the Supreme Court, we must deny his cross-appeal.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's rejection of the officers' qualified-immunity claim in denying their motion for judgment notwithstanding the verdict and for new trial and **AFFIRM** the remittitur of damages.

———————————

**DISSENT**

———————————

ROGERS, Circuit Judge, dissenting.  I agree that the relevant inquiry in this case is whether, viewed objectively, the actions of Officers Edgell and Honsowetz indicated that they acted as law enforcement officers or as emergency medical responders. Because the nature of the officers' actions is a mixed question of law and fact, this court should review the legal aspect of that determination de novo.  Under de novo review, Officers Edgell and Honsowetz acted as emergency medical responders, and thus they are entitled to qualified immunity.

Officers Edgell and Honsowetz are entitled to qualified immunity if their activities, objectively viewed, indicate that they were acting as medical responders as opposed to law enforcement officers.  Maj. Op. at 9–10 (citing *Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 219 (6th Cir. 2007)).  The jury's determination does not control the legal aspect of this issue.  The Supreme Court has held:

> In determining whether a Fourth Amendment violation occurred we draw all reasonable factual inferences in favor of the jury verdict, but as we made clear in *Ornelas v. United States*, [517 U.S. 690, 697–99 (1996)], we do not defer to the jury's legal conclusion that those facts violate the Constitution.

*Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005).  In *Muehler*, a woman detained during a search of a house pursuant to a warrant sued the officers who had executed the warrant under 42 U.S.C. § 1983, arguing that "she was detained for an unreasonable time and in an unreasonable manner in violation of the Fourth Amendment."  *Id.* at 96 (internal quotation marks omitted).  The district court found that the officers were not entitled to summary judgment on the issue of qualified immunity, and the Ninth Circuit affirmed. *Id.* at 97.  After a trial, a jury concluded that the plaintiff had been detained in violation of the Fourth Amendment and awarded her $60,000 in damages.  *Id.*  The Ninth Circuit again affirmed.  *Id.*  The Supreme Court vacated and remanded the judgment, holding

that even if all of the facts were construed in the plaintiff's favor, the defendants were entitled to qualified immunity. *Id.* at 97–98. In doing so, the Court reviewed the application of the qualified immunity legal standards to the facts de novo, even though the appeal was from a jury verdict. *Id.* at 98 n.1.

In the present context, this rule requires this court to defer to the jury's conclusions on factual issues such as whether Officer Honsowetz asked Alexandra McKenna if her father had assaulted her. This rule, however, requires independent appellate review of "whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Ornelas*, 517 U.S. at 696–97 (insertions in original) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). Here, the relevant standard concerns whether the officers acted as law enforcement officers or as emergency medical responders, and this court must therefore review the answer to this question de novo.

This conclusion is consistent with the policy rationale underlying *Ornelas*. In *Ornelas*, the Supreme Court considered the standard of review applicable to probable cause and reasonable suspicion determinations. 517 U.S. at 695. The Court acknowledged that reasonable suspicion and probable cause "are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The Court further noted that these two standards "are not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 695–96 (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 232). This same characterization applies to the question of whether Officers Edgell and Honsowetz acted as law enforcement officers or as emergency medical responders; this is also a standard that deals with the factual and practical considerations of everyday life, and it would likewise be difficult to develop neat rules to delineate between law enforcement and emergency medical response. Like probable cause and reasonable suspicion determinations, this question of law enforcement versus medical response is a "fluid concept[] that take[s] [its] substantive

content from the particular contexts in which the standard[] [is] being assessed." *Id.* at 696. Even so, de novo appellate review is appropriate for all of these concepts; indeed, such review is "necessary if appellate courts are to maintain control of, and to clarify, the legal principles." *Id.* at 697. This is perhaps all the more true here, in the context of a newly enunciated standard. Deference to fact-finders, in contrast, would lead to "varied results" which "would be inconsistent with the idea of a unitary system of law." *Id.*; *see also Indmar Prods. Co., Inc. v. Comm'r*, 444 F.3d 771, 785–86 (6th Cir. 2006) (Rogers, J., concurring) (noting the importance of reviewing the legal aspects of mixed questions of law and fact de novo to prevent "inconsistent law" from being "applied to similarly situated persons, even after appeal to a single appellate court").

This court's varying precedents on the standard of review applicable to probable cause and exigent circumstances determinations do not provide a basis for ignoring the Supreme Court's holdings from *Muehler* and *Ornelas*. Mixed questions of law and fact, such as probable cause and exigent circumstances determinations, are sometimes reviewed deferentially—when the relevant dispute concerns the underlying facts—and are at other times reviewed de novo—when the relevant dispute concerns the application of law to the underlying facts. This court's precedents state both of these principles clearly with respect to both probable cause and exigent circumstances determinations. *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts."); *Ross v. Duggan*, 402 F.3d 575, 585 (6th Cir. 2004) (holding in a § 1983 suit that whether "pre-arrest probable cause existed on a given set of facts" is "a mixed issue of law and fact reviewed by the courts de novo" (citing *Ornelas*, 517 U.S. at 696–98)); *Peterson Novelties, Inc. v. Clinton Twp.*, 225 F.3d 659 (Table), 2000 WL 1091487, at *4 (6th Cir. 2000) ("[T]he [district] court's factual findings on the existence of exigent circumstances will be disturbed only if they are clearly erroneous." (second alteration in original) (internal quotation marks omitted) (quoting *United States v. Johnson*, 9 F.3d 506, 508 (6th Cir. 1993))); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) ("This court reviews de novo the district court's legal conclusions with respect to the issue of exigency."). At other times, however, we have been less

clear about when the underlying issues are legal or factual, and this may have led to some drift of the applicable standard of review between that for legal questions and that for factual questions. *See Indmar*, 444 F.3d at 785–86 (Rogers, J., concurring) (describing how such drift could occur). And in at least one case, we have apparently held that both deferential and non-deferential standards of review apply to the same issue:

> The question of whether a set of historical facts amounts to probable cause is a mixed question of law and fact appropriate for *de novo* appellate review. In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.

*Wrubel v. Bouchard*, 65 F. App'x 933, 936 (6th Cir. 2003) (internal quotation marks omitted) (citations omitted).

The clearest example of review-standard drift is in *Jones v. Lewis*, 874 F.2d 1125 (6th Cir. 1989). *Jones* stated simply:

> Although, in a motion to suppress evidence in a criminal case, the factual determination whether exigent circumstances existed to excuse a warrantless arrest is a question for the court, when the issue arises in a civil damage suit it is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion.

*Id.* at 1130 (citations omitted). In so holding, the court relied upon three other circuit court cases that, properly read, do not support such a flat holding.[1]

---

[1]In one cited case, *Hindman v. City of Paris, Texas*, 746 F.2d 1063 (5th Cir. 1984), the Fifth Circuit cited its own precedent in explaining that "where facts relied upon to show probable cause in a § 1983 action [for false arrest] are controverted, they must be resolved by the jury before controlling legal principles are applied." *Id.* at 1067 (insertion in original) (internal quotation marks omitted). Thus, the cited case held that the factual aspect of probable cause must be decided by the jury before the legal aspect can be decided by the court. This distinction was omitted when *Hindman* was cited by *Jones*. The same flaw ultimately underlies *Jones*' citation to *Giordano v. Lee*, 434 F.2d 1227 (8th Cir. 1970). *Giordano* stated that "in civil rights actions . . . where a genuine issue of fact on the existence of probable cause for arrest is presented, the question should be submitted to the jury." *Id.* at 1230. *Giordano* cited a Supreme Court case, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), for this proposition. *Giordano*, 434 F.2d at 1230. But *Adickes* held only that summary judgment was inappropriate in a civil rights case where a purely factual dispute remained contested, 398 U.S. at 157, and thus did not stand for the conclusion reached by *Giordano* that mixed questions of law and fact ought also to be submitted to the jury and reviewed, in both their factual and legal aspects, deferentially. Finally, the third case cited by *Jones*, *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985), did clearly state that "where the issue [of probable cause] arises in a damage suit, it is . . . a proper issue for the jury if there is room for a difference of opinion." But the Seventh Circuit has since overruled this holding of *Llanguno* in light of *Ornelas* and

Outside of the exigent circumstances context, the general principle that we review the legal aspect of mixed questions of law and fact de novo is relatively well preserved. In the probable cause context, we recently outlined the distinction between the legal and the factual aspects of this mixed question of law and fact:

> When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court. [Case citations omitted.]
> All of these Sixth Circuit cases stand for the proposition that a jury trial is appropriate where reasonable disputes of material fact exist on facts underlying a probable cause determination. However, where only one reasonable reading of the facts is possible, i.e., where the facts that relate to probable cause are not in dispute, the question of probable cause retains its legal character and should be decided by the judge. We admit that some of these Sixth Circuit cases are confusing and many of the factual recitals in them do not lend themselves to a clear understanding of exactly what facts were in dispute. Nevertheless, the rule that probable cause is a legal question seems clear.
> If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts. Similarly, with qualified immunity, a court can submit to the jury the factual dispute with an appropriate instruction to find probable cause and qualified immunity if the factual inquiry is answered one way and to find probable cause and qualified immunity lacking if the inquiry is answered in another way. However, the jury does not decide whether the facts it has found are legally sufficient to amount to probable cause or entitlement to qualified immunity.

*Hale*, 396 F.3d at 728.

But even if we have not always correctly applied *Ornelas* and *Muehler* to other aspects of our Fourth Amendment jurisprudence, we are bound to apply them correctly here. These cases provide two clear holdings: First, appellate courts review the legal aspect of mixed questions of law and fact under the Fourth Amendment de novo. *Ornelas*, 517 U.S. at 696–98. Second, this standard of review applies to § 1983 suits as well as to criminal appeals, and it applies even when an appellate court is reviewing a

---

*Graham v. Connor*, 490 U.S. 386 (1989). *Bell v. Irwin*, 321 F.3d 637, 640–41 (7th Cir. 2003). In the Seventh Circuit's words, *Ornelas* and *Graham* stand for the proposition that "[j]udges rather than juries determine what limits the Constitution places on official conduct." *Id.* at 641.

jury verdict. *Muehler*, 544 U.S. at 98 n.1. We should therefore review the legal aspect of the determination of the nature of the officers' actions de novo.

Viewed objectively in the light most favorable to McKenna, the evidence from trial establishes that Officers Edgell and Honsowetz acted as emergency medical responders. The officers responded to Alexandra's 911 call reporting that her father appeared to be choking and was perhaps having a seizure. When the officers arrived, Alexandra directed them to her father's room. The officers attempted to speak to McKenna but found him unresponsive. Officer Honsowetz then pulled Alexandra aside and asked her whether her father had taken any drugs, whether and where there were any medicines or illegal drugs in the house, and whether anything similar had ever previously occurred. Alexandra responded that her father had not taken any drugs, that the family stored medicines in her father's bathroom cupboard, and that nothing similar had ever previously occurred. Officer Honsowetz also asked Alexandra if her father had tried to hit her, and she responded that he had not.

The officers then asked McKenna to sit up, and they instructed Alexandra to make the same request of her father. McKenna remained unresponsive. The officers eventually forced McKenna to sit on the side of the bed, despite his continued attempts to lie down. Once McKenna was sitting up, the officers asked him to put on his pants. When McKenna did not respond to this request, the officers tried to dress McKenna in his pants. At some point during this period, McKenna mumbled the word "stop." When the officers attempted to stand McKenna up to finish dressing him in his pants, McKenna was able to free himself from the officers' grip; McKenna fell onto the bed, and one of the officers fell backwards towards McKenna's bedroom dresser. The officers then handcuffed McKenna's wrists and ankles. McKenna's only physical resistance to this point had been his attempts to lie down, and he had not to this point acted in an aggressive manner towards the officers. Once handcuffed, McKenna struggled against his restraints, and the officers held him down on the bed. Soon after the officers had handcuffed McKenna, the first firefighters and Emergency Medical Response personnel

arrived at the McKenna residence. McKenna, still handcuffed, was placed on a stretcher, taken downstairs to an ambulance, and then transported to a hospital.

After the arrival of the firefighters and EMS personnel, Officers Edgell and Honsowetz searched McKenna's bathroom cabinet and the top drawer of his bedroom dresser. In searching the bedroom dresser, the officers ousted much of its contents. At some point, the officers requested that their dispatcher run McKenna's license plate. The officers did not run McKenna's information through the Law Enforcement Information Network, which is standard procedure whenever there is suspicion of criminal behavior.

The officers' actions were more consistent with emergency medical response than with enforcing the law. The most general facts are the most probative: the officers arrived in response to a 911 call complaining of a medical emergency, and the results of the officers' response were that McKenna was taken to the hospital in an ambulance and that he received medical treatment. McKenna was never arrested, incarcerated, or charged with any crimes. *Cf. Mills v. Hall*, No. 06-15689, 2008 WL 2397652, at *8 (E.D. Mich. June 10, 2008). Neither the handcuffing of McKenna nor the search of the bedroom and bathroom is indicative of criminal investigation. The officers' handcuffing of McKenna might not have been an ideal response to McKenna's medical needs, but if we believe Alexandra's testimony that McKenna was not posing any threat to the officers at the time they handcuffed McKenna, the handcuffing also served no plausible investigative purpose.[2] The officers' search of the bathroom cabinet and McKenna's top dresser drawer was consistent with a search for medicines or illegal drugs that might explain McKenna's condition. The officers did not search any locations unlikely to contain medicines or illegal drugs, and their choice to search the bathroom cabinet followed naturally from Alexandra's identification of that cabinet as the likely location of any medicines in the house. The only activity during the entire encounter that might

---

[2]If, contrary to Alexandra's testimony, the handcuffing served the purposes of controlling McKenna's unpredictable behavior and of protecting the officers' safety, then it was not unreasonable.

Firefighter Lambouris's testimony that firefighters do not handcuff patients is not probative of any relevant issue. Firefighters do not handcuff patients because firefighters do not carry handcuffs. They do carry leather restraints, and they use them when necessary.

plausibly be viewed as more consistent with a criminal investigation than with a medical response was questioning Alexandra as to whether her father had tried to hit her. But even this question was not clearly inconsistent with a medical response, as it might have both assisted the officers in diagnosing the nature of McKenna's condition and alerted them to any possible danger that McKenna might have posed. Even if this question was investigatory, it certainly cannot alone overcome the remainder of the evidence, all of which strongly indicates that Officers Edgell and Honsowetz were acting as emergency medical responders.

Because, objectively viewed, the officers were acting as emergency medical responders, they are entitled to qualified immunity. I would therefore reverse the judgment of the district court.