In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 20-1109

GLORIA TAYLOR, individually and as Independent Administrator of the Estate of STEVEN TAYLOR, Deceased,

*Plaintiff-Appellant,*

*v.*

CITY OF MILFORD, a municipal corporation, *et al.,*

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:17-cv-02183 — **Colin S. Bruce**, *Judge.*

———————

ARGUED APRIL 22, 2021 — DECIDED AUGUST 19, 2021

———————

Before WOOD, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* In 2016, Gloria Taylor called 911 seeking medical care for her husband, Steven, who was experiencing a diabetic emergency at their home in Milford, Illinois. Officer Joseph Garrett responded to the call and restrained Steven in a prone position, face down on his bed, for several minutes. Steven vomited and lost consciousness, and he did not regain consciousness before passing away in the

hospital ten days after the incident at sixty-one years old. After the district court granted summary judgment to the Defendants, Plaintiff appealed the district court's judgment with respect to whether Defendant Garrett was entitled to qualified immunity based on his conduct within the Taylor home. As we explain below, the district court erred in granting qualified immunity to Garrett at the summary judgment stage.

## I. Background

 On August 17, 2016, Gloria called 911 for an ambulance for her husband, a diabetic, whose blood sugar had dropped dangerously low.[1] Gloria reported that Steven had dropped a plate and told her that "he was having a sugar spell."

In addition to suffering from diabetes, Steven had experienced several cardiac events in the last several years. He suffered a heart attack in 2008 and underwent triple bypass surgery. He then received arterial stenting in 2012, 2013, and 2015, and suffered a second heart attack in 2016. He was released from the hospital from treatment for his heart attack on August 10, 2016, just one week prior to the diabetes incident that led to this case.

Following Gloria's 911 call, the county dispatcher requested an ambulance to respond to a person experiencing a diabetic emergency. There are no full-time firefighters or EMS personnel in the small village of Milford, so two volunteer EMTs, Frank and Fred Hines, responded to the dispatcher's

---

[1] We refer to members of the Taylor family by their first names to avoid confusion, given that there are four different Taylor family members—Gloria, Steven, and their nieces Serena and Shannon—involved in the events leading to this case.

request. As the Hineses drove to the fire station to collect an ambulance to respond to Gloria's call, they passed by Defendant Garrett, who indicated that he would also respond to the call, since he was already close to the Taylor residence. Garrett is Milford's only full-time police officer. He had previously volunteered as an EMT for a different city, and he earned his certification to serve as a paramedic from the State of Illinois in 2004.

The parties' accounts differ regarding what transpired in the time between Garrett's arrival at the Taylors' home and the ambulance's departure from the home with Steven. It is undisputed that Garrett entered the home, confronted Steven in his bedroom, and placed Steven in a prone restraint on the bed. Steven then vomited and lost consciousness sometime before or shortly after the EMTs arrived, who then took Steven to the hospital by ambulance. Steven did not regain consciousness and died in the hospital ten days later.

According to the Taylors, Steven was confused in his hypoglycemic state when Garrett appeared in his bedroom. Steven asked Garrett why he was there, and asked for some orange juice, which his niece Serena offered. Garrett ordered Serena to step back and did not allow her to give Steven the orange juice. Serena also explained to Garrett that Steven had a bad heart and suggested that Garrett should speak calmly to her uncle. Despite Serena's warning, Garrett proceeded to force Steven face down onto his bed. Garrett used his own weight to hold Steven down, restrained Steven's right hand behind his back, and pressed Steven's lower back into the bed using his elbow. Garett also used his left hand to apply pressure behind Steven's ears in order to inflict pain on Steven to keep him in this position. With Steven's knees on the ground,

Garrett's restraint position forced Steven's face into the blankets on his bed. Steven protested that he could not breathe, but Garrett continued to use his weight to keep Steven in this prone position. The Taylors pleaded with Garrett to let up, but he refused. While Garrett held Steven in this restraint on the bed, Steven vomited, further obstructing his breathing. EMT Fred Hines testified that Steven "coded" when the ambulance arrived, and doctors told the Taylors that Steven had not been breathing for around twenty-five minutes by the time the ambulance arrived at the hospital.

In Garrett's telling, he only restrained Steven because it was clear that Steven was a danger to himself. As the district court summarized, Garrett "testified that he started to restrain Steven after Steven head-butted the wall and hit the closet with his fist, causing Garrett to believe Steven was going to harm himself more and needed to be restrained for his own safety." Garrett further testified that "Mr. Taylor was showing signs where he could potentially be dangerous. He was starting [to] get in an aggressive stance. He was not making sense. He was confused, incoherent speaking." As a result, Garrett called for backup from the county, so that "if I had to go hands-on with him, … more people [would be] there." Garrett testified that he told Steven that the ambulance was on its way, and that Steven stumbled and fell onto the bed before Garrett had put his hands on him. Steven hit the closet with "his whole upper body" and hit his head. Garrett maintains that he did not feel threatened by Steven, but he decided to use "pressure points and hand control tactics to place him on the bed." He then forced Steven into a position where his upper body was on the bed and his legs were on the floor. According to Garrett, Steven kept "trying to push up … to turn over one way or the other … kept trying to kick me with his

feet … [and] he was grabbing my duty belt, my shirt right around my duty belt and my vest." So he used "pressure points behind the ear to keep him – to get [Steven] back down when he started lifting me up off the bed." When Serena offered orange juice, Garrett was unsure that Steven would drink it, but he denies stopping Serena from giving Steven the juice. Garrett testified that although he saw vomit on Steven's face once the EMTs placed him on the stretcher to be taken to the hospital, Garrett did not see vomit on his face in the bedroom and he did not know when Steven had vomited. Additionally, Garrett testified that Steven had not lost consciousness before the EMTs arrived, because he "was still thrashing about," but that he did lose consciousness at some point, "[w]hen he stopped thrashing about and just stood still or laid still."

Serena and Shannon agreed that Steven was stumbling and mumbling when Garrett arrived at the Taylor home. Serena insists, however, that Steven was not behaving violently. She did not see her uncle headbutt the wall, but she did testify that he accidentally hit a lamp and the closet door while stumbling around the bedroom. Their description of Steven's hypoglycemia symptoms is consistent with the testimony of one of Steven's treating physician's, Dr. Zasada, who explained that hypoglycemic patients may act confused, "tired[,] sluggish, lethargic," and possibly "rowdy defensively because they don't understand what's going on, but not aggressive." Both Serena and Shannon testified that their uncle requested orange juice in Garrett's presence, but Garrett did not allow them to give it to him.

Once at the scene, the EMTs initiated CPR, but Steven never regained consciousness. He died on August 28, 2016

when life support was withdrawn. One of his treating physicians, Dr. Brian Field, testified that the primary causes of Steven's death were poor oxygenation of the brain, acute hypoxic respiratory failure, and cardiac arrest, though an autopsy was not performed. During his time in the hospital,[2] he also contracted pneumonia and suffered respiratory failure.

After Steven's passing, Gloria, both individually and as the administrator of Steven's estate, sued Officer Garrett and the City of Milford under 42 U.S.C. § 1983, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Illinois Wrongful Death Act, and the Illinois Survival Act. At summary judgment, the district court found in Officer Garrett and the City of Milford's favor on all counts and entered judgment in favor of Defendants. On appeal, Gloria has not challenged the district court's rulings on her *Monell* and state law claims, and only challenges the district court's finding that Garrett was entitled to qualified immunity. In response, Garrett urges us to affirm the district court's qualified immunity analysis, or in the alternative, to find that he is still entitled to summary judgment based on the plaintiff's failure to establish causation.

## II. Analysis

We review the district court's grant of summary judgment and Officer Garrett's assertion of qualified immunity de novo. *See Balsewicz v. Pawlyk*, 963 F.3d 650 (7th Cir. 2020). To affirm, we must find that no genuine issue of material fact exists and

---

[2] The EMTs initially brought Steven to Iroquois Hospital but an emergency room physician transferred him to St. Mary's Hospital in Kankakee shortly after Steven arrived at Iroquois in order to get a neurological consult.

that the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "In applying this standard, all disputed issues of fact are to be resolved in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

## A. Garrett's Liability under Section 1983 and Qualified Immunity

The central question in this appeal is whether Garrett is entitled to qualified immunity as a matter of law. Qualified immunity is an affirmative defense, but once the defendant raises it, "the burden shifts to the plaintiff to defeat it." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2722 (2020).

Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). When assessing a defendant's assertion of qualified immunity, we ask: "whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Id.* Our "focus 'is on whether the officer had fair notice that [his] conduct was unlawful.'" *Balsewicz*, 963 F.3d at 656–57 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

**1. Fourth Amendment Right**

The Fourth Amendment grants that the "right of the people to be secure in their persons, … against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Although police officers may use force to seize another person under appropriate circumstances, the Fourth Amendment protects against the use of excessive force. *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). "The question whether a particular use of force has crossed the constitutional line is governed by the Fourth Amendment, which prohibits unreasonable seizures." *Id.* at 448 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). We analyze excessive force cases under an objective reasonableness standard. *Graham*, 490 U.S. at 388.

This analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015) (citing *Graham*, 490 U.S. at 396).

When it comes to deadly force, "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent

danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *see also Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018). In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court held that a police officer violated a suspect's Fourth Amendment rights when the officer shot the suspect as he tried to flee the scene. Though the officer feared that the suspect would escape arrest, the Court stated plainly that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11.

Viewing all of the facts in the light most favorable to the Plaintiff, we find that a reasonable jury could conclude that Garrett violated Steven's Fourth Amendment right to be free from unreasonable seizures when Garrett applied deadly force to a non-suspect civilian who was not resisting arrest and did not pose an imminent threat to any officer, bystander, or himself. Garrett used physical force in a manner that restrained Steven's liberty, effectuating a seizure of Steven. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). Moreover, the nature and quality of the intrusion by Garrett was severe—as told by Serena and Shannon, Garrett aggressively restrained Steven for several minutes using his full body and police tactics intended to inflict pain and induce submission to the officer's will despite the fact that Steven was not a threat to him. *Graham*, 490 U.S. at 396. And Garrett continued to apply this force, despite Steven's alleged pleas that he could not breathe and even after he vomited and lost consciousness. Yet the "countervailing governmental interest[] at stake" was slight— Steven did not pose an immediate threat to himself or anyone else, and paramedics who could offer medical treatment for Steven's suspected hypoglycemia were already on their way. *See id.* Furthermore, Garrett did not carry a first aid kit with

him, he did not check or monitor Steven's vital signs, and he did not permit Steven to drink the orange juice that his niece offered (which was likely the most immediately accessible treatment for hypoglycemia). If we accept, as we must, Plaintiff's version of the facts, the force Garrett deployed against Steven was not a proportional response to Steven's mumbling and stumbling around his bedroom.

### 2. Clearly Established

Our analysis next turns to whether Garrett's violation of Steven's constitutional rights was clearly established in 2016. *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021). This step of the analysis requires specificity—"[f]or the law to be clearly established, the 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Though specificity is important, it does not require a case presenting the exact same facts. *Id.* at 988. The right must be "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Weinmann*, 787 F.3d at 450. "Law enforcement officers, the [Supreme] Court has stressed, 'can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Strand*, 910 F.3d at 915 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, determining whether Garrett's violation of Steven's rights was clearly established in 2016 requires findings of fact, which we cannot make at this stage of the litigation. Indeed, several cases leave us with the firm conviction that under *Graham*, and taking the facts most favorable to the Plaintiff, a jury could conclude that Garrett applied excessive force to Steven in violation of Steven's clearly established rights. *See*

*McAllister*, 615 F.3d at 885 ("While none of these cases involve the same scenario at issue here—the use of force against a diabetic following a car accident resulting from hypoglycemic shock—they do suggest that [the defendant officer] should have been on notice that elements of his conduct could violate [the plaintiff's] constitutional rights."); *McCue v. City of Bangor, Me.*, 838 F.3d 55, 64 (1st Cir. 2016) ("Even without particular Supreme Court and First Circuit cases directly on point, it was clearly established in September 2012 that exerting significant, continued force on a person's back while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.") (internal quotations omitted) (citing *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)).

First, "[i]t is clear, … that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever*." Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). In *Clash*, officers responded to a 911 call reporting that someone was armed—in fact, it was the plaintiff's 12-year-old who had pointed a toy gun at his sibling in a grocery store parking lot while waiting for their parents. *Id.* at 1046–47. A "virtual armada" of officers pulled over the plaintiff's vehicle, ordered the family out, and searched the driver for weapons. *Id.* They found none. *Id.* Still, officers handcuffed him and shoved him into a patrol car, injuring his knees. *Id.* We agreed with the district court that the record did not clearly show whether or not the officer had violated clearly established law and dismissed the appeal for lack of jurisdiction. *Id.* at 1048–49.

Here, the Plaintiff's account of the facts also "draw[s] into question the objective reasonableness of the police action." *Clash*, 77 F.3d at 1048–49. Resolving the factual disputes in favor of the Plaintiff leaves us with a scenario in which an officer deployed aggressive restraint tactics—tactics that were much *more* forceful than the shoving and pushing described in *Clash*—against an innocent civilian, without any provocation beyond some mumbling and stumbling around a bedroom in his own home.

Second, we have previously held that continuing to apply unnecessary force against a civilian once he is already subdued may be an unreasonable use of force. *See Strand*, 910 F.3d at 915 ("If the facts and circumstances show that an individual who once posed a threat has become 'subdued and complying with the officer's orders,' the officer may not continue to use force."); *see also Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) ("[T]here is no doubt that an unnecessary kick, after a suspect is under control, violates the suspect's clearly established rights."); *Abdullahi*, 423 F.3d at 764–66. In *Abdullahi*, we held that questions of fact precluded a finding of qualified immunity on summary judgment where officers restrained a civilian suffering from a PTSD episode. 423 F.3d at 464–66. There, officers responded to a 911 call from a nurse who had stopped to help a man who appeared to be in distress but who had attacked the nurse when she approached him. *Id.* at 764–65. Three officers worked together to subdue him on his stomach. *Id.* One officer ended up placing his knee on the decedent's back and "applied his weight to keep [him] from squirming of flailing." *Id.* The officer "increased the pressure on [the decedent's] back until [he] stopped arching his back upward." *Id.* The decedent lost consciousness and died two and a half minutes after "officers had taken him to the

ground." *Id.* at 766. Under those circumstances, we held that the facts, taken in the light most favorable to the plaintiff, precluded summary judgment on qualified immunity for the defendant officer. *Id.* at 773. There, we said that "the record supports an inference that [the officer] knelt on [the decedent] with enough force to inflict lethal injuries." *Id.* at 770.

The facts of *Abdullahi*, at the summary judgment stage, are not so different from the facts of this case.[3] Here, viewing all of the evidence in the light most favorable to the Plaintiff, Garrett continued to apply significant restraints to Steven even *after* he was restrained on the bed and had vomited and lost consciousness. We acknowledge that Garrett tells the facts differently. But, as we observed in *Abdullahi*, though different inferences can be drawn from the facts, "it is for a jury, and not for us, to weigh all the evidence and choose between competing inferences." *Id.*

Third, existing case law demonstrates that a medical emergency does not extinguish a civilian's Fourth Amendment rights. *See id.* The district court eschewed the cases cited above and others cited by Plaintiff because those cases did not involve a medical emergency in which the officers involved did not play some kind of law enforcement role. This reasoning is flawed. Though a medical emergency may in some cases justify the use of force when providing medical aid, we reject the notion that responding to a medical emergency gives police officers an absolute license to disregard the Fourth

---

[3] The facts of *Abdullahi* do differ from the facts here in that the civilian there had attacked a nurse; whereas here, there is no argument that Steven posed a threat to Garrett or another third party.

Amendment.[4] "[A] person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for 'it is surely anomalous to say that the individual … is fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (quoting *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 530 (1967)); *see also Policky v. City of Seward, Neb.*, 433 F. Supp. 2d 1013 (D. Neb. 2006). Rather, courts should consider medical necessity, and the role that a law enforcement officer plays in addressing that medical necessity, as part of their assessment of the *Graham* factors.

*McAllister* lends guidance. In that case, officers responded to a traffic accident that the plaintiff caused when his "blood sugar level plummeted, sending him into a severe hypoglycemic state." 615 F.3d at 879. Believing that the plaintiff was intoxicated, the defendant officer forcibly removed the plaintiff from his car, threw him to the ground, and used a knee to subdue him, despite indications that the plaintiff may have been suffering from a medical emergency, rather than intoxication. *Id.* The officer handcuffed the driver once he was on the ground and left him convulsing on the pavement. *Id.* The plaintiff suffered a broken hip and bruised lung as a result. *Id.*

---

[4] Moreover, while an "officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; … an officer's good intentions [will not] make an objectively unreasonable use of force constitutional." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (quoting *Graham*, 490 U.S. at 397). Garrett's subjective intent to aid Steven is thus irrelevant.

at 880. In affirming the district court's denial of qualified immunity, we held that:

> [Our case law] would not suggest to a reasonable officer that he may slam an unresponsive, convulsing driver into the ground with force sufficient to break the driver's hip and place his knee on the driver's back with enough force to bruise his lung. Such conduct goes beyond the bounds of the plaintiff's clearly established Fourth Amendment rights and thus deprives the defendant of qualified immunity.

*Id.* at 886. Accordingly, we held that "[e]ven if [the defendant officer] was justified in using some force to remove [the plaintiff] from the vehicle, using the force involved here against a non-resisting suspect could have been unreasonable given the circumstances." *Id.* at 884.

The Sixth Circuit addressed a similar situation in *McKenna v. Edgell*, 617 F.3d 432, 435 (6th Cir. 2010) where it affirmed the denial of qualified immunity to two officers who restrained a civilian who was suffering from a seizure. When officers arrived at the home in response to a 911 call that an individual was choking or having a seizure, the officers instructed the seizing individual to get out of bed and put his pants on. *Id.* When he could not comply, the officers tried to pick him up and ultimately handcuffed him. *Id.* at 435–36. While in the home, the officers searched the house, ran the decedent's car's plates, and questioned others about the decedent's drug use. On appeal, the court reasoned that the officers' entitlement to qualified immunity depended on whether the officers acted as law enforcement or as emergency medical responders at the decedent's home. *Id.* at 439–40. The court noted that this inquiry was an objective one. Thus it was irrelevant "whether

[the officers] had a law-enforcement or medical-response *in-tent*; the focus must be on what *role* their actions reveal them to have played." *Id.* at 440 (emphasis added). Finally, the court held "the objective determination of the role that the officers played … is properly a jury question because the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury." *Id.* at 441 (internal quotations omitted).

To review, three principles are clear: First, officers do not have a right to assault civilians without provocation. *Clash*, 77 F.3d at 1048. Second, officers may not use unnecessary force when a civilian is already subdued or compliant. *Strand*, 910 F.3d at 915. Third, a medical emergency impacts the objective reasonableness of a seizure, but an emergency does not "eviscerate" the civilian's Fourth Amendment rights. Taking these principles together, it has been clearly established that the method and manner of restraint must fit the circumstances of the particular case. *See McAllister*, 615 F.3d at 879–80. Officers can employ only those means of restraint appropriate in a given situation. This is especially so for lethal force. In other words, it was clearly established by 2016 that an officer who forcibly restrained a civilian who was not a suspect of a crime and who did not pose a threat to those around him, resulting in vomiting and loss of consciousness before the officer released the civilian, violated that civilian's Fourth Amendment rights.

We acknowledge that the Plaintiff's and Defendant's accounts of the events diverge with respect to the facts surrounding the incident, including whether Steven was a threat to himself or others, whether Garrett's actions served a medical or law enforcement purpose, and whether the force used

was objectively reasonable under the circumstances. Each of these material disputes of fact must be determined by the jury, so that the court can properly assess Garrett's entitlement to qualified immunity.

"[S]ince the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Abdullahi*, 423 F.3d at 773 (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) ("'[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations,' particularly where 'the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.'") (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010)). Here, the district court erred by implicitly crediting Garrett's version of the facts and finding that Garrett was acting in a medical capacity and therefore entitled to qualified immunity.

Defendant urges us to approve the district court's reading of our decision in *Thompson v. Cope*, 900 F.3d 414 (2018), but that decision does not control the outcome of this case. In *Thompson*, a paramedic responded to an emergency call to treat an animal bite. *Id.* at 418. Upon arriving at the scene, the paramedic discovered that the animal bite was in fact a human bite, inflicted by a naked and belligerent suspect who law enforcement officers were struggling to restrain. *Id.* The paramedic believed the suspect to be high on amphetamines

and administered a sedative to calm the suspect down. *Id.* At some point, the suspect stopped breathing and ultimately passed away eight days later. *Id.*

The district court held that the paramedic had acted as a law enforcement officer and denied summary judgment, so we reviewed the interlocutory appeal for legal error only. *Id.* at 419. We reversed the district court's denial of qualified immunity for the paramedic because the administration of the sedative to a "combative" and likely under-the-influence suspect (who had bitten another person) was not a clearly established violation of the decedent's constitutional rights. *Id.* at 423. We were skeptical that a "paramedic (or his lawyer) … would have understood that the Fourth Amendment … applies to treatment in the field during a medical emergency." *Id.* at 422–23.

The facts and posture of this case differ from *Thompson*. First, although Garrett may have had training as a paramedic, he responded to Gloria's 911 call dressed and equipped as a law enforcement officer, arriving without any kind of medical supplies or equipment with which he might have treated a civilian suffering from a hypoglycemic "sugar spell." Thus a jury could reasonably infer that Garrett responded as a law enforcement officer, not as an emergency medical provider. Though we do not suggest that labels alone should dictate the analysis in this kind of situation,[5] the function of the state actor is certainly a relevant consideration in assessing the objective reasonableness of a particular use of force. Second, unlike

---

[5] *Cf. Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) ("[F]rom the perspective of the arrestee, it matters not a whit whether it is the jailer or the doctor whose conduct deprives him of life-saving medical care.").

the undisputed facts in *Thompson*, it is not at all clear that Garrett was providing medical care to Steven by restraining him in the manner described. Here, critical facts are in dispute that may render Garrett's use of force unreasonable, and those facts must be decided by the jury.

Though rare, trial courts may consider qualified immunity after trial. *Estate of Escobedo v. Martin*, 702 F.3d 388, 398 n.4 (7th Cir. 2012). And although the Supreme Court has urged lower courts to determine the applicability of qualified immunity as soon as practicable,[6] it is sometimes impossible to resolve the qualified immunity question before trial. *See id.*; *see also Clash*, 77 F.3d at 1048 (where "the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made."). This is one such case. There may be a set of facts, established at trial, under which Garrett's use of force was not excessive, or was not clearly established as excessive. But taking the facts in the light most favorable to the Plaintiff at this stage, we cannot agree with the district court that Garrett's use of force did not violate Steven's clearly established constitutional rights. We thus reverse. Assuming this case goes to trial, the district court would be well-advised to use a specific jury verdict form to probe the facts that the jury finds to aid in any post-verdict determination of qualified immunity. *See Smith v. Finkley*, -- F.4th --, 2021 WL 3660880, at *19 (7th Cir. Aug. 18, 2021) ("When the issue of qualified immunity remains unresolved at the time of trial, … the district court may properly use special interrogatories to allow the jury to determine disputed

---

[6] *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).

issues of fact upon which the court can base its legal determi-
nation of qualified immunity.") (quoting *Warlick v. Cross*, 969
F.2d at 303, 305–06 (7th Cir. 1992)).

### B. Causation

Garrett argues in the alternative that Plaintiff failed to es-
tablish causation as to Steven's injuries, so that he is entitled
to summary judgment even if we find he is not entitled to
qualified immunity.

Section 1983 requires the plaintiff to show that Garrett
"cause[d]" the deprivation of Steven's constitutional rights.
42 U.S.C. § 1983. Causation is fundamentally a jury question.
*Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1016 (7th Cir. 2020);
*Wisc. Mut. Ins. Co. v. United States*, 441 F.3d 502, 505 (7th Cir.
2006). We have previously held that expert testimony is not
necessary to prove causation in a § 1983 action, though it is
difficult to establish causation without it. *See Cyrus v. Town of
Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010). "[T]he general
rule is that expert testimony is not necessary to prove causa-
tion 'if all the primary facts can be accurately and intelligibly
described to the jury, and if they, as men of common under-
standing, are as capable of comprehending the primary facts
and of drawing correct conclusions from them.'" *Id.* (quoting
*Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

Here, Plaintiff has presented evidence that men of com-
mon understanding could comprehend. *See id.* Taking the ev-
idence in the light most favorable to Plaintiff, Garrett applied
police restraint techniques to Steven, who vomited and then
lost consciousness while in those restraints and never re-
gained consciousness. But Plaintiff does not simply have to
rely on these facts, because she has also presented two expert

witnesses who opined that Steven died due to the force Garrett used to restrain him. Dr. Richard Friedlander, a cardiologist with forty years of experience opined that:

> It is my professional opinion based upon a reasonable degree of medical certainty that respiratory failure or respiratory compromise can result in a cardiac event in some instances. It is also my professional opinion based upon a reasonable degree of medical certainty that hypoglycemia does not necessarily lead to a cardiac event in every individual experiencing them. … [P]lacing the patient in a prone position and applying pressure to his body resulted in respiratory compromise which in turn led to loss of consciousness and a respiratory arrest. … Th[e] series of events strongly suggests that the cardiovascular collapse was not the result of a cardiac event. In other words, to a reasonable degree of medical certainty, this series of events strongly suggests that the cardiovascular collapse experienced by Mr. Taylor was the result of the respiratory compromise that resulted due to the pressure applied to his body.

A second doctor, Dr. Joel Silverman, who has twenty years of experience in critical medical care and pulmonology opined that, "[i]f the family's version of events is taken as true, given the condition Mr. Taylor was in, with a reasonable degree of medical certainty the cardiopulmonary arrest likely could have been caused by obstruction of his airway by Officer Garrett."

Doctors who treated Steven before his death could not say with certainty what series of medical events led to Steven's

death. For instance, one of the emergency room doctors who treated Steven opined that "there is no definite way" to determine whether Steven had first suffered from respiratory arrest or cardiac arrest. This treating physician also testified that he had never seen hypoglycemia itself lead to respiratory arrest. Steven's cardiologist also could not say with certainty which medical event came first—he could not "say what exactly caused Mr. Taylor's cardiac arrest."

Although the medical examiner did not perform an autopsy in this case, the expert opinions of Drs. Friedlander and Silverman adequately create a question of fact regarding whether Garrett's restraint tactics caused Steven's death. It may be the case that Steven's pre-existing medical conditions contributed to his inability to recover consciousness, but Steven's treating physicians' testimony further confirms that the question of causation is still clouded by factual disputes. Given the expert testimony and the "eggshell skull" rule,[7] causation is also a question for the jury.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings. As the parties and the district court prepare for

---

[7] "The tortfeasor takes his victim as he finds him. That is the 'eggshell skull' rule, which like most principles of the common law of torts is applicable to a constitutional tort case brought under 42 U.S.C. § 1983." *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (citing *Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1993); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1192–93 (9th Cir. 2002)).

trial, we suggest the use of a special verdict form to probe any determination by the jury to aid the district court should it need to reconsider the qualified immunity determination post-trial.