In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-3011

LELAH JERGER, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SHANNON BLAIZE, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:18-cv-00030 — **Richard L. Young**, *Judge*.

ARGUED JUNE 1, 2022 — DECIDED JULY 26, 2022

Before EASTERBROOK, WOOD, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is a messy set of facts arising out of a child welfare investigation. The Indiana Department of Child Services learned from a social worker that Lelah and Jade Jerger may not have been providing their infant daughter, J.J., medication prescribed to control epileptic seizures. A blood draw, the DCS case workers knew, would clarify whether that was so, and a series of urgent back-and-forths with the Jergers resulted in their taking J.J. to the

hospital for the test. The results showed that J.J. had started the prescription a few days earlier. But that was not the end of it. Litigation ensued, with the Jergers alleging violations of J.J.'s Fourth Amendment rights and their own Fourteenth Amendment due process rights to make medical decisions for their child. The district court decided that qualified immunity protected the DCS case workers and entered summary judgment in their favor. We vacate and remand, as the facts are too murky and contested to allow us to reach any legal conclusions with confidence.

# I

## A

Drawing on the summary judgment record, we set forth the facts in the light most favorable to the Jergers. See *Turner v. City of Champaign*, 979 F.3d 563, 565 (7th Cir. 2020). At just 15 months old, J.J. had experienced many seizures. After a series of tests in early 2017, doctors at Riley Hospital in Indianapolis diagnosed her with epilepsy. To help control the seizures—at least one of which resulted in J.J. turning blue and losing consciousness for about 15 seconds—doctors prescribed Keppra, an anticonvulsant. Lelah and Jade, however, worried about Keppra's side effects. So they delayed filling the prescription until they could get a second opinion. In the meantime, they treated J.J.'s seizures with CBD oil prescribed by a chiropractic neurologist.

Months later, the Jergers remained at a standstill over whether J.J. should take Keppra. On September 20, 2017, a concerned social worker at Riley Hospital, aware of the Jergers' decisions, called the Indiana Department of Child Services to report medical neglect of J.J. by Lelah and Jade.

The social worker described not only how several doctors had recommended Keppra to manage J.J.'s seizures, but also how the Jergers refused to give their daughter the medication because of its potential side effects. The social worker expressed concern that J.J. not taking the prescribed Keppra risked recurring seizures, long-term disability, and even death.

Allicyn Garrett was the DCS case worker assigned to learn more about the situation. On September 21, the day after receiving the report of parental neglect, she visited the Jergers' home to conduct a preliminary investigation. During that visit, Lelah acknowledged her initial reservations with putting J.J. on Keppra but also explained that only a few days earlier, after receiving a second medical opinion, she and her husband began giving their daughter the medication. But despite hearing this account, and after speaking with her supervisor Shannon Blaize, Garrett told the Jergers that they must sign a form agreeing to take certain actions. The form was a "Family Support/Community Services/Safety Plan," which required the Jergers, among other things, to agree to administer the prescribed Keppra to J.J. and to take the child that same day for a blood test to confirm the medication was in her system.

The Jergers declined to sign the Safety Plan but did take J.J. for the blood draw the next day, September 22. The results confirmed that J.J. had started taking Keppra, and so DCS dropped its investigation into Lelah and Jade. But what happened in between Garrett's presentation of the Safety Plan and the eventual blood test gave rise to this litigation and remains the subject of serious debate.

From the Jergers' perspective—the view we must credit at this stage of the proceedings—Lelah and Jade submitted J.J.

to the blood draw only because of a threat leveled by Garrett. From Lelah and Jade's understanding, noncompliance with the case workers' demand would lead to J.J. becoming a "Child in Need of Services" (or CHINS for short) and them losing the right to make medical decisions on her behalf. This threat, they thought, amounted to coercion and left them no choice but to take J.J. for the blood draw.

In February 2018 the Jergers filed a complaint under 42 U.S.C. § 1983, alleging that Garrett and Blaize's investigation and demand for a blood test amounted to constitutional violations of both their rights as parents under the Fourteenth Amendment's Due Process Clause and J.J.'s own rights under the Fourth Amendment.

Following discovery, each party moved for summary judgment. In framing their respective positions, both sides agreed that the Jergers' claims—the Fourth Amendment claim that Lelah and Jade brought on behalf of J.J. and their own Fourteenth Amendment claim as J.J.'s parents—turned on consent. If the Jergers agreed to submit J.J. to the blood draw, the DCS case workers would prevail, but if the opposite was true, and the decision was the product of coercion, then the district court should enter judgment in Lelah and Jade's favor. Overlaying the resolution of the consent issue was qualified immunity, to which Garrett and Blaize claimed they were entitled because they reasonably believed the Jergers agreed to the blood draw.

B

The district court entered summary judgment for the DCS defendants on the basis of qualified immunity. On the district court's view of the facts, Garrett and Blaize did not violate any

constitutional rights in persuading the Jergers to take J.J. for the blood draw. The reports from Riley Hospital supplied Blaize and Garrett with reasonable suspicion of child neglect and therefore the requisite "lawful authority [under the Indiana law] to threaten filing a motion to compel and opening a CHINS proceeding." From there, the district court acknowledged Garrett's alleged statement to the Jergers that, unless they promptly agreed to the blood draw, "J.J. would become a Child in Need of Service[s]." But the court was quick to add that Garrett also told the Jergers there would be a court hearing at which they could present their own perspective. In the end, the district court saw the DCS case workers' degree of influence as "close to the line" of coercion but not stepping over it.

Regardless, even if the Jergers had demonstrated potential constitutional violations, the district court determined that Garrett and Blaize were entitled to qualified immunity. The Jergers, the court explained, could not point to any case that would have put the DCS case workers on notice that their conduct in procuring consent by threat was problematic when evaluated in the totality of the difficult circumstances they confronted. Instead, all the Jergers relied on were cases supporting general propositions relating to the constitutionality of searches in the child welfare context. Because that showing did not suffice, the district court concluded that qualified immunity protected both defendants from having to defend themselves at trial.

The Jergers now appeal.

## II

To our eye, both the summary judgment briefs submitted in the district court and now the competing arguments pressed on appeal expose material disagreement on the issue of consent—whether the Jergers chose of their own volition to take J.J. for the blood draw or whether that decision was the product of coercion. The disagreement played out in oral argument too, with both parties urging us to accept inferences aligned with their perspective on that question.

As a court of review, however, our obligation is to take our own independent look at the record and ask whether the facts, when viewed in the light most favorable to the Jergers, permit judgment for the DCS defendants. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The same perspective on the facts must guide our review of the award of qualified immunity at summary judgment. If the facts, as represented by the Jergers, portray a clearly established constitutional violation, the district court's decision cannot stand. See *Taylor v. City of Milford*, 10 F.4th 800, 806, 812 (7th Cir. 2021) (reversing qualified immunity when the plaintiff's version of the facts, in contrast to those alleged by the defendant, "ma[d]e out a deprivation of a constitutional right").

We have hard time aligning the district court's conclusions with these principles. A few illustrations prove our point. Each of these examples comes from the summary judgment record and we set them forth, as we must, as the Jergers present them.

*Example #1: Threat about CHINS Proceeding Outcome*: According to Lelah Jerger's deposition testimony, during the September 21 investigatory visit, when she asked what would

happen if her and her husband refused to sign the DCS Safety Plan, Garrett responded by saying that DCS "would file a motion to compel and that J.J. *would* become a Child in Need of Services." In that same testimony, Lelah explained that she understood this statement to mean DCS would be "able to make medical decisions for J.J., instead of us, through the court."

*Example #2: No Time to Hire a Lawyer*: Both Lelah and Jade testified that Garrett, after leaving their home the morning of September 21, called later in the day to say they had to take J.J. for a blood draw that same night. By Lelah's account, the Jergers asked if they could speak with an attorney first, but Garrett told them that there was no time to get legal counsel: "You have to be at the hospital today."

*Example #3: Police Presence at the Hospital*: Both Lelah and Jade also testified that upon arriving at the hospital, they were met by police officers. Lelah explained that she believed the officers were there "to make sure [they] did" the test. For his part, Jade testified that he felt the police officers were there "for intimidation purposes."

A reasonable jury, crediting the Jergers' perspective on these three matters, could find that the DCS case workers employed coercion to get Lelah and Jade to go through with the blood draw on September 22. Foremost, Lelah could have heard Garrett's admonition that J.J. "*would* become a Child in Need of Services" as a statement informing her and her husband of a certain outcome—that the impending CHINS court proceeding, with which they were unfamiliar, was sure to result in them losing their right to make medical decisions for their daughter. Garrett said nothing else to convey a different message; nor did the summary judgment record supply any

reason to believe the Jergers understood much at all about CHINS proceedings or their rights. See *Nicole K. ex rel. Linda R. v. Stigdon*, 990 F.3d 534, 536–37 (7th Cir. 2021) (describing in detail the complexity of CHINS proceedings); see also *Ashley W. v. Holcomb*, 34 F.4th 588, 590–91, 593 (7th Cir. 2022) (acknowledging the wide "scope and complexity of CHINS proceedings").

On that understanding, the Jergers could have concluded that they had no real choice but to take J.J. for the blood draw. Lelah and Jade's testimony that they had no time to seek legal advice to better understand their rights and DCS's authority only adds to that conclusion, as does their perspective on why the police were present at the hospital upon their arrival with J.J.

Taking these facts together, the Jergers paint a picture of coercion, not "freely and voluntarily given" consent. *United States v. Ahmad*, 21 F.4th 475, 478 (7th Cir. 2021) (quoting *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992)). And lacking consent, a search or seizure pursuant to a child welfare investigation is reasonable under the Fourth Amendment only if supported by a court order, probable cause, or exigent circumstances. See *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000); but see *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (explaining that reasonable suspicion, and not probable cause, is the standard for evaluating the constitutionality of child welfare investigations impinging on the right to familial integrity under the Fourteenth Amendment Due Process Clause).

Remember, too, that the only issue on appeal is consent. Indeed, at oral argument, the defendants conceded that they offer no other justification for the search—neither a warrant,

nor probable cause, nor exigent circumstances (with the latter concession surprising us). Thus, without the consent Blaize and Garrett rely on, and no other proffered justification for the search, the Jergers have done enough to create a jury question on whether the DCS defendants violated their and J.J.'s constitutional rights.

Our law, too, is clear that some threats used to obtain compliance with a child welfare investigation violate clearly established constitutional rights. See, *e.g.*, *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 482 (7th Cir. 2011) (holding that "it is improper to obtain consent to a safety plan through duress or other illegal means" including when a case worker threatens "to take an action that she has no legal authority to take"); *Dupuy v. Samuels*, 465 F.3d 757, 763 (7th Cir. 2006) (putting case workers on notice that threatening to take an action without having legal authority to take that action violates constitutional rights); *Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003) (finding unconstitutional case workers' threats to remove children from their parents' custody because the case workers lacked lawful authority to do so). Of course, "specificity is important" in defining clearly established law, but there need not be "a case presenting the exact same facts" for defendants to be on notice that their behavior violates constitutional rights. *Taylor*, 10 F.4th at 807.

The facts before us are so disputed as to limit what we can do on appeal. All we can say for sure is that a jury—accepting Lelah and Jade's version of events—could conclude that Garrett and Blaize acted in violation of the Jergers' clearly established rights. A reasonable case worker would have known that threatening expedited CHINS proceedings with a predetermined outcome—one that terminated Lelah and Jade's

rights to make medical decisions for J.J.—and leaving no time for the Jergers to seek legal advice went too far in procuring the blood test.

Of course, the defendants disagree—and strongly so—with the Jergers' portrayal of the facts. But that is precisely our point. Summary judgment is not available in the face of this factual tug-of-war. Nor is qualified immunity where the parties dispute facts material to the consent question. Everything depends on whose version of the facts to credit, whose account is most credible, and whose perspective aligns best with the totality of the difficult circumstances all parties found themselves in as the underlying events played out over those couple of days in September 2017. See *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); see also *Taylor*, 10 F.4th at 809, 810–11 (7th Cir. 2021). In the final analysis, "it is for a jury, and not for us, to weigh all the evidence and choose between competing inferences." *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005).

To be sure, "[t]his is not the final word on qualified immunity for this case." *Smith v. Finkley*, 10 F.4th 725, 749 (7th Cir. 2021). The mess of facts concerning the Jergers' consent only "precludes a ruling on qualified immunity *at this point*." *Id.* at 750 (quoting *Strand v. Minchuk*, 910 F.3d 909, 918–19 (7th Cir. 2018)) (emphasis added). The jury's ultimate resolution of the facts may allow the district court to grant qualified immunity to the DCS case workers at trial. See *id.* (collecting cases); see also *Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021) (explaining that though factual issues made qualified immunity at the summary judgment stage improper, "a jury may resolve disputed facts in [the defendant's] favor, and

the district court could then determine he is entitled to qualified immunity as a matter of law").

Until then, however, the record before us leaves no choice but to vacate the entry of summary judgment for the defendants.

### III

This appeal presents a clear example of the important and delicate circumstances child welfare case workers face every day. Indeed, the law recognizes the "compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." *Brokaw*, 235 F.3d at 1019 (quoting *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). Acting on that interest often requires balancing weighty and sometimes competing considerations—of children, parents, and the state—and making decisions on less-than-perfect information without the benefit of much time to deliberate.

Beyond our conclusion about the disputed facts at the center of the issue presented on appeal, we cannot avoid a closing observation. Having spent substantial time with the summary judgment record, it seems that much of the disagreement between the parties—their sharply different perspectives on what led the Jergers to take J.J. for the blood draw—might have been avoided by the DCS case workers taking steps to better inform the Jergers about the legal proceedings the state intended to commence and what rights the Jergers would have before and during those proceedings. For example, Garrett might have explained to Lelah and Jade the purpose of a CHINS proceeding and the relief DCS intended to request. She could have also described how, even in the case of an

expedited proceeding, the Jergers could seek legal advice and take an attorney with them to the CHINS hearing. Finally, the DCS defendants might have done well to clarify that all decisions would be made by an impartial judge and that the Jergers would not lose any parental rights until the judge evaluated the evidence and arguments presented by both parties. And so too could a step be taken, whether in writing or through an audio recording, to memorialize the information conveyed to the Jergers and their responses.

In no way are we suggesting that the case workers shouldered any affirmative obligation to advise the Jergers. But tapping the brake pedal long enough to convey objective and accurate information to the Jergers about DCS's intentions and their rights in any impending CHINS proceedings may have kept this difficult situation from ever getting to a courthouse. Of course, DCS is much better positioned than a federal court to discern whether and how best to implement that observation in practice.

With these parting observations, we VACATE the district court's entry of summary judgment for the defendants and REMAND for trial.